**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**LEATRICE A. BLACKMON,**

                                        **Plaintiff,**

          **v.**                                             **5:12-CV-00643**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

                                        **Defendant.**

**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**THOMAS J. McAVOY**
**Senior United States District Judge**

### DECISION and ORDER

          Plaintiff Leatrice A. Blackmon brought this suit under § 205(g) of the Social Security

Act ("Act"), as amended, 42 U.S.C. § 405(g), to review a final decision of the Commissioner

of Social Security ("Commissioner") denying Plaintiff's application for disability and

supplemental security benefits.

**I.        FACTS**

          **A.  Procedural history**

          On October 1, 2009, Leatrice Blackmon ("Plaintiff") protectively filed applications for

supplemental security income and disability insurance benefits alleging disability beginning

August 5, 2006, due to a heart condition, depression, diabetes, and anemia.  (Administrative

Transcript ("Tr.") at 152-56, 157-63, 178, 183).  After a hearing, Administrative Law Judge

("ALJ") Augustus C. Martin denied the application.  (Tr. 11-22).

In his decision, the ALJ found Plaintiff "has not engaged in substantial gainful activity since August 5, 2006, the alleged onset date." (Tr. 13). He found Plaintiff suffered from the severe impairments of a back disorder, coronary artery disease, anemia, hypertension, obesity, and depressive disorder. (Tr. 13). He also found that Plaintiff did not meet the criteria for a listed impairment. (Tr. 14). The ALJ determined that Plaintiff retained the following Residual Functional Capacity ("RFC"): Plaintiff can "perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)." (Tr. 15). Additionally, the ALJ found that Plaintiff "is unable to perform any past relevant work" and "there are jobs that that exist in significant numbers in the national economy that . . . [Plaintiff] can perform." (Tr. 21-22). Accordingly, the ALJ concluded Plaintiff has not been disabled since August 5, 2006. (Tr. 22).

On February 27, 2012, the Appeals Council denied a request for review. (Tr. 1-4). This action followed. This court has jurisdiction of this action. 42 U.S.C. §§ 405(g), 1383(c).

## B. Medical history

On August 5, 2006, Plaintiff visited the emergency room complaining of atypical chest pain. (Tr. 245-46). On examination, Plaintiff's "hematocrit was low at 33 with a [mean cell volume ("MCV")] of 60." (Tr. 245). Plaintiff underwent an electrocardiogram, which revealed inferior T-wave abnormality. (Tr. 245). Plaintiff "was admitted to the catheterization lab for emergency angioplasty." (Tr. 245). Catheterization revealed "essentially single-vessel disease with 99% posterior descending artery lesion;" "a 90% small PLV [posterior left ventricular lesion];" "moderate concentric left ventricular hypertrophy;" and "ejection fraction 65% with focal mild distal inferior hypokinesis." (Tr. 245). Plaintiff underwent stenting of the posterior descending artery and balloon angioplasty. (Tr. 245). Laboratory results revealed

"severe iron deficiency anemia, which is essentially chronic for [Plaintiff]." (Tr. 245). Plaintiff was discharged on August 7, 2006, with plans for an anemia work-up. (Tr. 245).

On November 21, 2006, Plaintiff treated with Bruce Silverstein, M.D., for, inter alia, depression and "on and off" headaches. (Tr. 324). Plaintiff reported "severe problems with depression" and requested an increase in her dosage of Zoloft. (Tr. 324). Dr. Silverstein prescribed Zoloft among other medications. (Tr. 324).

On January 22, 2007, Plaintiff treated with Dr. Silverstein. (Tr. 327). Plaintiff complained of insomnia, forgetfulness, and "being depressed since 2002." (Tr. 327). Dr. Silverstein diagnosed Plaintiff as suffering from anxiety and depressive disorder among other impairments. (Tr. 327). He increased her dosage of Zoloft. (Tr. 327).

On May 30, 2007, an x-ray of Plaintiff's left knee was performed, which revealed "[r]elatively symmetric medial and patellofemoral joint space arthritis." (Tr. 318).

On September 8, 2007, Plaintiff's laboratory results revealed that her hemoglobin, mean cell volume, mean cell hemoglobin, and mean corpuscular hemoglobin concentration levels were low. (Tr. 466). The results also revealed that her red blood cell count, glucose, and red cell distribution width, cholesterol, triglycerides and low-density lipoprotein levels were high. (Tr. 466, 467).

On October 23, 2007, Plaintiff treated with Christopher A. Nardone, M.D., for recurrent myocardial assessment after experiencing recent symptoms of atypical chest pain. (Tr. 266-67). An exercise stress test was performed, which revealed that Plaintiff was "borderline positive for myocardial ischemia by ECG criteria." (Tr. 267).

On January 15, 2008, Plaintiff's laboratory results revealed that her mean cell volume, mean cell hemoglobin, and mean corpuscular hemoglobin concentration levels were low. (Tr. 313). The results also revealed that her glucose, red blood cell count, cholesterol, triglycerides and low-density lipoprotein levels were high. (Tr. 313, 314).

On June 11, 2008, Plaintiff treated with Dr. Silverstein for, inter alia, headaches and blurred vision. (Tr. 305-06). Dr. Silverstein diagnosed her as suffering from visual disturbances and a disorder of the tympanic membrane among other impairments. (Tr. 305). He ordered a CT scan of her brain, which revealed a "5 mm focus of low attenuation in the right caudate head, characteristic in appearance of a small old lacunar infarct[ion]." (Tr. 305).

On June 11, 2008, Plaintiff's laboratory results revealed that her hemoglobin, hematocrit, mean cell volume, mean cell hemoglobin, and mean corpuscular hemoglobin concentration levels were low. (Tr. 298).

On July 29, 2008, Plaintiff treated with Dr. Silverstein for right ankle pain and anger/mood problems. (Tr. 301). Dr. Silverstein diagnosed Plaintiff as suffering from an ankle sprain/strain among other impairments. (Tr. 301). He ordered an x-ray of the right ankle. (Tr. 301). He discontinued Zoloft and prescribed Pristiq. (Tr. 301).

On July 29, 2008, an x-ray of Plaintiff's right ankle was performed, which revealed "[s]purring off the calcaneus." (Tr. 300).

On September 4, 2008, Plaintiff treated with Dr. Silverstein for depression and ankle pain. (Tr. 296-97). Plaintiff reported that she stopped taking Pristiq because it caused vomiting and nausea. (Tr. 296). Dr. Silverman diagnosed Plaintiff as suffering from depressive disorder, not elsewhere classified, and anxiety among other impairments. (Tr. 296. He discontinued Pristiq and prescribed Zoloft. (Tr. 296).

On December 12, 2008, Plaintiff treated with Dr. Silverstein for, inter alia, bilateral knee pain and lower back pain. (Tr. 290). Dr. Silverstein diagnosed her as suffering from osteoarthritis among other impairments. (Tr. 290).

On January 21, 2009, Plaintiff treated with Dr. Silverstein for lower back pain. (Tr. 288-89). Dr. Silverstein diagnosed her as suffering from sprains/strains of the thoracic and sacroiliac regions. (Tr. 288). He ordered x-rays of her spine. (Tr. 288).

On January 21, 2009, an x-ray of Plaintiff's lumbar spine was performed, which revealed: "mild disc space narrowing at the L4-5 and L5-S1 levels as well as the L3-4 level;" anterior osteophytes of the L2 through the L5 vertebral bodies; and vascular calcifications in the soft tissues. (Tr. 286). An x-ray of the thoracic spine was also performed which revealed "mild degenerative disc spaces." (Tr. 287). An x-ray of the cervical spine was also performed, which revealed "[a]lignment abnormalities and degenerative changes in the cervical spine." (Tr. 643).

On February 12, 2009, Plaintiff treated with Dr. Silverstein for lower back pain. (Tr. 283). On examination, Dr. Silverstein found positive lower back pain. (Tr. 283). He diagnosed Plaintiff as suffering from depressive disorder, not elsewhere classified; anxiety; and osteoarthritis. (Tr. 283).

On March 5, 2009, Plaintiff treated with William Beals, M.D., for depression. (Tr. 613-16). On examination, Dr. Beals found limited eye contact, "decreased volume to voice," and a "profoundly flat affect." (Tr. 614). He diagnosed Plaintiff as suffering from major depressive disorder, recurrent episode; moderate. (Tr. 614). He discontinued Zoloft and prescribed Cymbalta.

On March 23, 2009, Plaintiff treated with Dr. Silverstein for lower back pain. (Tr. 281). Plaintiff complained that Amrix was not helping. (Tr. 281). Dr. Silverstein diagnosed her as suffering from sprains/strains of the sacroiliac region among other impairments. (Tr. 281). He prescribed Ultram. (Tr. 281).

On April 3, 2009, Plaintiff was evaluated by consultative examiner, Kalyani Ganesh, M.D., for an internal medicine examination. (Tr. 482). On examination, Dr. Ganesh found that Plaintiff could not squat and could not walk on heals and toes. (Tr. 483). She also found "[l]umbar spine flexion 45 degrees, extension 10 degrees, lateral flexion 5 degrees bilaterally, and rotation 5 degrees bilaterally." (Tr. 484). She diagnosed Plaintiff as suffering from anemia, hypertension, and a history of lower back pain and knee pain among other impairments. T 485. She opined that Plaintiff "has a mild to moderate limitation to lifting, carrying, pushing, and pulling secondary to [coronary artery disease ("CAD")]." (Tr. 485).

On April 3, 2009, Plaintiff was evaluated by consultative examiner, Kristen Barry, Ph. D., for a psychiatric evaluation. (Tr. 477-81). On examination, Dr. Barry found that Plaintiff's posture was slouched; her overall manner of relating and social skills were poor; her affect was rather apathetic and dysphoric; and her mood was dysthymic and helpless. (Tr. 479). Dr. Barry also noted that Plaintiff's intellectual functioning was estimated to be in the low-average range. (Tr. 479). She diagnosed Plaintiff as suffering from depressive disorder, not otherwise specified; heart problems; and high blood pressure. (Tr. 480).

On April 9, 2009, Plaintiff treated with Dr. Beals for depression. (Tr. 617). On examination, Dr. Beals found that Plaintiff's affect was flat, and that she had decreased eye contact. (Tr. 617). Plaintiff reported she "doesn't feel the Cymbalta has helped much with [her] mood." (Tr. 617). She also reported experiencing conflict with her husband. (Tr. 617).

Plaintiff further reported non-restorative sleep at night and pain in the bottom of her feet. (Tr. 617). Dr. Beals diagnosed Plaintiff as suffering from diabetes mellitus; peripheral diabetic neuropathic pain; and major depressive disorder, recurrent episode, moderate. (Tr. 617). He increased her dosage of Cymbalta and prescribed Amitriptyline. (Tr. 619). Dr. Beals provided prescription refills on November 23, 2009, December 8, 2009, and August 2, 2010. (Tr. 618).

On April 9, 2009, Dr. Beals completed a medical source statement. (Tr. 495-501). He stated that Plaintiff was suffering from peripheral diabetic neuropathic pain and recurrent major depression. (Tr. 495). He noted that her symptoms include a flat affect, anhedonia, headaches, tiredness, pain in the feet and fingers, sadness, irritability, impaired concentration, and feeling overwhelmed. (Tr. 495). Dr. Beals further stated that Plaintiff was tapered off Zoloft and prescribed Cymbalta and Elavil. (Tr. 496). He opined that Plaintiff's depression was chronic, and that her prognosis was guarded. (Tr. 496). He also noted that Plaintiff's mental status examination revealed "markedly decreased eye contact," decreased voice volume, and a flat affect. (Tr. 497). He further opined that due to her depression, Plaintiff was limited in understanding and memory; sustained concentration and persistence; social interaction; and adaption. (Tr. 500).

On May 13, 2009, Dr. P. Kudler completed a psychiatric review technique form. (Tr. 502-15). Dr. Kudler stated that Plaintiff was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration persistence or pace. (T 512).

On May 13, 2009, Dr. Kudler also completed a mental RFC assessment form. (Tr. 516-19). Dr. Kudler opined that Plaintiff was moderately limited in the following abilities:

carry out detailed instructions, maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 516-17).

On May 27, 2009, State agency analyst, L. Nyce, completed a physical RFC assessment form. (Tr. 520-25). Analyst Nyce stated that Plaintiff was limited in the ability to push or pull with the upper extremities. (Tr. 521).

On March 16, 2010, Plaintiff treated with Rick Goins, D.C. T 625. Plaintiff reported experiencing new moderately severe constant neck pain, which is "made worse by looking down, looking up, and repetitious movements." (Tr. 625). Plaintiff also reported "frequent moderate numb[ness] and pins and needles sensations with burning and achy pain in the shoulders." (Tr. 625). Plaintiff further reported severe lower back pain, which is "a lot more uncomfortable due to coughing, sneezing, bending, getting out of bed, and getting in and out the car." (Tr. 625). On examination, Dr. Goins found posterior subluxation of C1; left posterior displacement of the sixth cervical segment; left posterior rotation subluxation of C7; and that a lumbar segment L5 was in a right posterior maligned position. (Tr. 625). He also found a severe hypertonic muscle spasm in the lumbar paraspinal muscles bilaterally and gluteal muscles bilaterally and a severe degree of swelling at C1, C6 to C7, T2, L2 to L3, L5, and the left ilium. (Tr. 625). He further found Kemp's test positive on the right, Soto-Hall test

positive on the right, Nachlas test positive bilaterally, and shoulder depression test positive bilaterally. (Tr. 625). He assessed Plaintiff's condition as acute. (Tr. 626).

On March 31, 2010, Plaintiff presented to the emergency department complaining of pain in the right flank. (Tr. 774). Plaintiff reported that the pain "is a little bit worse with movement, a little bit better with rest, but is just there all the time." (Tr. 774). Plaintiff did not "get out of the wheelchair to get up in the bed because she said it hurts too much." (Tr. 774). On examination, Plaintiff was "in moderately severe distress." (Tr. 774). Plaintiff was diagnosed as suffering from "[r]ight flank pain probably musculoskeletal." (Tr. 775). Plaintiff was prescribed Lortab for severe pain and Ibuprofen for milder pain. (Tr. 775).

On April 9, 2010, Plaintiff treated with Dr. Goins for pain in the back, shoulders, neck, and forearms. (Tr. 625). On examination, Dr. Goins found "[a] strong pain level at L2 to L3, L5, and the left ilium bilaterally and [a] moderate pain level at C1, C6 to C7 and T2 bilaterally" on palpation. (Tr. 626). He also found "a marked degree of swelling at C1, C6 to C7, T2, L2 to L3, L5 and the left ilium bilaterally . . . accompanied by an edema of a severe degree at C1, C6 to C7, T2, L2 to L3, L5, and the left ilium bilaterally." (Tr. 626). He assessed Plaintiff's condition as acute. (Tr. 626).

On April 16, 2010, Plaintiff treated with Dr. Goins. (Tr. 629). On examination, Dr. Goins found the following: the first cervical vertebra was in a right posteriorly rotated subluxation; the sixth cervical vertebra was in a left posteriorly rotated position; left posterior displacement of the seventh cervical segment; vertebral segment T2 was posterior and inferior on palpation; posterior rotation subluxation of L2 on the left; the third lumbar vertebra was rotated posteriorly on the left; and the fifth lumbar vertebra was in a right posteriorly rotated subluxation. (Tr. 629). Dr. Goins administered chiropractic adjustment to the

cervical spine, lumbar area, and thoracic spine in order to reduce subluxation of the segments and also to help improve mobility. (Tr. 629).

On April 20, 2010, Plaintiff treated with Dr. Goins for pain in the back, shoulders, neck, and forearms. (Tr. 629). On examination, Dr. Goins found that cervical segment C1 was in a right posterior maligned position; posterior subluxation of C6 on the left; left posterior rotational subluxation of C7; vertebral segment T2 was posterior and inferior on palpation; the 2nd lumbar vertebra was rotated posteriorly on the left; the 3rd lumbar vertebra was rotated posteriorly on the left; and a posterior subluxation of L5 on the right. T 629. He also found a severe amount of hypertonic muscle contraction in the suboccipital muscles bilaterally, cervical paraspinal muscles bilaterally, and upper thoracic muscles bilaterally. (Tr. 629-30). He further found "an extreme amount of muscle tightness and spasm in the lumbar paraspinal muscles bilaterally." (Tr. 630).

On April 30, 2010, Plaintiff treated with Dr. Goins for pain in the back, shoulders, neck, and forearms. (Tr. 631). Plaintiff reported, inter alia, "that there is a no improvement in the degree of her left and right lumbar pain." (Tr. 631). On examination, Dr. Goins found "a swelling of a severe degree at C1, C6 to C7, T2, L2 to L3, L5, and the left ilium bilaterally." T 631. He noted that "[t]he nature of . . . [Plaintiff's] condition is acute." (Tr. 631).

On May 4, 2010, Plaintiff treated with Dr. Goins. (Tr. 631). Plaintiff reported a new onset of "constant moderately severe pain bilaterally in the neck." (Tr. 631). On examination, Dr. Goins found "a very intense level of pain and discomfort at L2 to L3, L5, and the left ilium bilaterally and a moderate pain and discomfort at C1, C6 to C7, and T2 bilaterally." (Tr. 632). He also found "a severe amount of swelling at C1, C6 to 0, T2, L2 to L3, L5, and the left ilium bilaterally." (Tr. 632).

On July 23, 2010, Plaintiff visited St. Josephs Hospital Health Center complaining of chest pain.  (Tr. 676).  Plaintiff reported that the "pain is located in the left upper chest" and "radiates to the left arm."  (Tr. 676).  Plaintiff explained that her "chest pain was precipitated by physical activity," is "[w]orse with exertion" and "[b]etter with rest."  (Tr. 676).  She also reported that associated symptoms included left arm pain.  (Tr. 676).  Plaintiff was diagnosed as suffering from chest pain.  (Tr. 677).  Plaintiff was administered nitro-bid paste topically and Morphine sulfate intravenously.  (Tr. 680).

On September 20, 2010, Dr. Goins completed a medical source statement.  (Tr. 689-91).  Dr. Goins noted that Plaintiff was diagnosed as suffering from nonallopathic lesions in the lumbar and lumbosacral regions, degeneration of the lumbar/lumbosacral intervertebral discs, and lower back pain.  (Tr. 681).  He opined that given Plaintiff's impairments and work-related limitations, Plaintiff would be off-task for more than 20 percent during an 8-hour workday; is likely to be absent from work more than four days per month; and needs a job that permits shifting positions at will from sitting, standing, or walking.  (Tr. 689, 691).  He also opined that Plaintiff will need to take unscheduled breaks during an 8-hour workday lasting fifteen minutes.  (Tr. 690).  He further opined that Plaintiff can never lift 50 pounds and can rarely lift 25 pounds.  (Tr. 690).

## II.      STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries.  See 42 U.S.C. § 405(g).  First, the court must determine whether the Commissioner applied the correct legal standard.  See Tejada v. Apfel, 167 F. 3d 770, 773 (2d Cir.1999); Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F. 2d 8, 9 (2d Cir.1990); Shane v. Chater, 1997 WL 426203, at *4 (N.D.N.Y. July 16, 1997) (Pooler, J.) (citing

<u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court reviews whether the Commissioner's findings are supported by substantial evidence within the administrative record.  See <u>Tejada</u>, 167 F. 3d at 773; <u>Balsamo</u>, 142 F. 3d at 79; <u>Cruz</u>, 912 F. 2d at 9; <u>Rutherford v. Schweiker</u>, 685 F. 2d 60, 62 (2d Cir.1982).  The Commissioner's finding will be deemed conclusive if supported by substantial evidence.  <u>See</u> 42 U.S.C. § 405(g); <u>see</u> <u>also</u>, <u>Perez</u>, 77 F. 3d at 46; <u>Rivera v. Sullivan</u>, 923 F. 2d 964, 967 (2d Cir. 1991).  In the context of Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  Although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately "'a remedial statute which must be liberally applied; its intent is inclusion rather than exclusion." <u>Vargas v. Sullivan</u>, 898 F. 2d 293, 296 (2d Cir. 1990) (quoting <u>Rivera v. Schweiker</u>, 717 F. 2d 719, 723 (2d Cir. 1983)) (internal quotation marks omitted).  Where the record supports disparate findings and provides adequate support for both the plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations.  <u>See</u> <u>Quinones v. Chater</u>, 117 F. 3d 29, 36 (2d Cir. 1997) (citing <u>Schauer v. Schweiker</u>, 675 F. 2d 55, 57 (2d Cir. 1982)); <u>Alston v. Sullivan</u>, 904 F. 2d 122, 126 (2d Cir. 1990).

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The administrative

regulations established by the Commissioner require the ALJ to apply a five-step evaluation

to determine whether an individual qualifies for disability insurance benefits.  See 20 C.F.R.

§§ 404.1520, 416.920; see also Williams v. Apfel, 204 F. 3d 48, 48–49 (2d Cir.1999); Bush

v. Shalala, 94 F.2d 40, 44–45 (2d Cir. 1996).

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has
> a "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment which is listed in Appendix 1 of
> the regulations, [t]he [Commissioner] presumes that a
> claimant who is afflicted with a "listed" impairment is unable to
> perform substantial gainful activity.  Assuming the claimant
> does not have a listed impairment, the fourth inquiry is
> whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally,
> if the claimant is unable to perform his past work, the
> [Commissioner] then determines whether there is other work
> which the claimant could perform.  Barry v. Schweiker, 675 F.
> 2d 464, 467 (2d Cir.1982).

## III.    DISCUSSION

### A.  Dr. Beals

#### 1.  Whether Dr. Beals's opinion was controlling

Plaintiff argues that the ALJ erred when he accorded little weight to treating

physician Dr. Beals's decision.  The Court finds that the ALJ did not err in this regard.  An

ALJ is required to find a treating physician's opinion to be controlling when the opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in your case record."  20 C.F.R.

404.1527(c)(2).  "On the other hand, in situations where 'the treating physician issued

opinions that [were] not consistent with other substantial evidence in the record, such as the

opinion of other medical experts,' the treating physician's opinion 'is not afforded controlling weight." Pena ex rel. E.R. v. Astrue, 2013 WL 1210932, at *15 (E.D.N.Y. March 25, 2013) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion ... that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given.").

The ALJ was correct in declining to accord Dr. Beals's opinion controlling weight. Dr. Beals's opinion is contrary to the opinions of other physicians. According to Dr. Beals, Plaintiff was limited in her understanding and memory, concentration and persistence, social interaction, and adaptation. (Tr. 500). Dr. Barry's and Dr. Kudler's assessments were contrary to Dr. Beals's findings. Dr. Barry, a consultative psychiatrist, opined that Plaintiff was an intelligent person. (Tr. 480). She also found Plaintiff to be able to maintain her attention and concentration fairly well. (Tr. 480). Dr. Kudler, in his mental residual functional capacity assessment, found Plaintiff to be not significantly limited to moderately limited in her understanding and memory, concentration and persistence, social interaction, and adaptation. (Tr. 517). Dr. Kudler concluded that Plaintiff was capable of "simple, unskilled jobs." (Tr. 518). Because there was substantial evidence contrary to Dr. Beals's opinion, the ALJ did not err in declining to find Dr. Beals's opinion to be controlling.

## 2. Whether the ALJ accorded appropriate weight to Dr. Beals's opinion

Plaintiff argues that "[e]ven if a treating physician's opinion is not given 'controlling weight,' it is still entitled to deference and the ALJ must assess" the six factors provided in

20 C.F.R. 404.1527. P. Mem. 13-14; see Halloran, 362 F.3d at 32.[1] Plaintiff contends that

the ALJ erred because he did not explain his considerations of all six factors provided in 20

C.F.R. § 404.1527. The Court finds this argument unavailing.

While the ALJ is required to "comprehensively set forth reasons for the weight

assigned to a treating physician's opinion" such to provide the claimant with an explanation

of the "good reasons for the weight given to a treating physician's opinion," Halloran, 362

F.3d at 33; see also Snell, 177 F.3d at 133; 20 C.F.R. §§ 404.1527(d) (2), 416.927(d)(2),[2]

> where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." [Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir.1983) (per curiam)]; see also Halloran, 362 F.3d at 32; [Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)]. Similarly, where "application of the correct legal standard could lead to only one conclusion, we need not remand." Schaal, 134 F.3d at 504.

Petrie v. Astrue, 412 Fed. Appx. 401, 407 (2d Cir. March 08, 2011).

Here, the ALJ properly considered Dr. Beals's opinion and accorded it appropriate

weight although he not explicitly address each factor set forth in 20 C.F.R. § 404.1527(d)(2).

The Court reaches this conclusion because it is clear from the ALJ's opinion that he

---

[1]      An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. Id.

Halloran, 362 F.3d at 32.

[2](the Social Security Administration "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion").

considered all relevant factors and because, on a review of the record, application of the correct legal standard could lead to only one conclusion.

As to length of the treatment relationship and frequency of examination, the ALJ specifically identified the limited length of the treatment relationship as a reason why he accorded little weight to Dr. Beals's opinion. (Tr. 21). The ALJ also considered the nature and extent of the treatment relationship. In his opinion he stated that the first appointment Plaintiff had with Dr. Beals was an "initial examination" and the second appointment was a follow up. (Tr. 19-20).

The ALJ considered the supportability of medical findings in the record. He noted Dr. Beals's observations that, among other things, Plaintiff arrived on time for her initial examination and her eye contact was good although she spoke softly. (Tr. 19). Plaintiff denied any suicidal ideation and showed no signs of hallucinations, delusions, or thought disorder. (Tr. 19). She further indicated that her symptoms had improved somewhat on Zoloft. (Tr. 19). Dr. Beals suggested tapering off of Zoloft and switching to Cymbalta, and noted at the follow up appointment that Plaintiff's affect remained flat but that her eye contact was still good. (Tr. 20). Plaintiff reported that the Cymbalta had not helped much and that she had stress over her relationship with her husband. (Tr. 20). Dr. Beals suggested increasing the dosage of Cymbalta and undergoing counseling. (Tr. 20). Dr. Beals also observed at the follow-up examination that Plaintiff's memory and concentration appeared intact, her insight and judgment were good, she was polite and cooperative, and had clear speech and appropriate mood. (Tr. 20). These observations by Dr. Beals based upon two examinations, and his suggestion to switch and increase medications, and attend counseling, do not support his conclusion that Plaintiff was limited in all functions areas

secondary to her depression. It is also clear in the ALJ's opinion that he considered other substantial contradictory evidence. Specifically, he noted Dr. Barry's and Dr. Kudler's opinions that Plaintiff's disability did not substantially limit her ability. (Tr. 20). And finally, Dr. Beals never purported in the record to be a specialist in evaluating and treating psychiatric issues. (Tr. 495-501, 613-24).

Although the ALJ did not address each factor individually, it is clear from the record that he considered all necessary factors in deciding to accord little weight to Dr. Beals's opinion. See Halloran, 362 F.3d at 32 ("After carefully considering the entire record and the ALJ's opinion, we conclude that the ALJ applied the substance of the treating physician rule."). Moreover, it is clear from the record that consideration of the six factors leads only to the conclusion reached by the ALJ on this issue.

**B. Dr. Goins**

Plaintiff argues that the ALJ erred when he accorded little weight to Dr. Goins's opinion. P. Mem. 15. Specifically she argues that the ALJ should have given greater deference to Dr. Goins's opinion as a chiropractor. Id. This argument is unavailing.

The ALJ is allowed to use sources that are not accepted medical sources. 20 C.F.R. 404.1513(d). Chiropractors are included in this list of "other sources". 20 C.F.R. 404.1513(d)(1). Although ALJs should consider "other sources," the opinions of these sources are not entitled to any deference. Diaz v. Shalala, 59 F.3d 307, 313-14 (2d. Cir. 1995); Marziliano v. Sullivan, 771 F. Supp. 69, 75 (S.D.N.Y. 1991). The final decision on weighing evidence belongs to the ALJ.

The ALJ properly considered Dr. Goins's opinion and opted to accord his opinion little weight. Dr. Goins was properly considered an "other source." As such, his opinion

was not entitled to deference.  The ALJ, in his opinion, dedicated three paragraphs to the details of Dr. Goins's findings.  (Tr. 16-17).  At the end of his opinion, the ALJ stated he gave little weight to Dr. Gions's opinion because Dr. Goins was not an accepted medical source and because Dr. Goins's opinon was not supported by other evidence in the record. (Tr. 21).

Although Plaintiff is correct in arguing that the ALJ should consider Dr. Goins's opinion, she does not argue or show that the ALJ failed to do so.  She does not identify any aspect of the ALJ's opinion that would support a conclusion that the ALJ improperly failed to consider Dr. Goins's opinion.  Because the ALJ considered Dr. Goins's opinion and was not obligated to give deference to this opinion, the Court finds no error in the ALJ's decision to accord little weight to Dr. Goins's opinion.

### C.  Dr. Silverstein

Plaintiff argues that the ALJ erred when he did not request an opinion from Dr. Silverstein on Plaintiff's function-by-function limitations.  P. Mem. 18.  This argument is unavailing because the Court finds no ambiguity in Dr. Silverstein's assessments. Furthermore, Plaintiff failed to identify any ambiguities in Dr. Silverstein's assessments.

The ALJ has a general affirmative duty to develop the record.  Perez v. Chater, 77 F.3d 41, 47 (2d. Cir. 1996).  The ALJ has a duty to re-contact the treating physician to gather more information when the record the physician provided is ambiguous.  Harper v. Astrue, No. 09-CV-00201, 2010 U.S. Dist. LEXIS 88637 at *21 (N.D.N.Y  2010).  "Where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional

information in advance of rejecting a benefits claim." Rosa v. Callahan, 68 F.3d 72, 79 n. 5 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)).

Plaintiff points to Harper v. Astrue to support her argument that the ALJ failed to complete the record. P. Mem. 18. In Harper, one of the treating physician's opinions in the record was ambiguous. 2010 U.S. Dist LEXIS 88637 at 20-21. The court identified a specific statement the physician made in the record that the ALJ could have interpreted in multiple ways. Id. at 20. The ALJ failed to take measures to eliminate the ambiguity. Id. at 21. The Second Circuit found this ambiguity to be grounds for remand. Id. at 23.

Here, Plaintiff fails to direct the Court to any ambiguities in Dr. Silverstein's assessment and the Court finds no ambiguities in its review of the record. Dr. Silverstein treated Plaintiff for depression, headaches, ankle pain, mood problems, and lower back pain. (Tr. 283, 288-89, 290, 301, 324). He ordered x-rays of Plaintiff that revealed mild disc space narrowing, vascular calcifications in the soft tissues, degenerative disc spaces in the thoracic spine, and alignment abnormalities in the cervical spine. (Tr. 286, 287, 643). To treat Plaintiff, he prescibed Zoloft, Ultram, and Pristiq. (Tr. 281, 301, 327). Dr. Silverstein's record of treatment of Plaintiff takes up approximately 200 pages of the administrative record. (Tr. 278-476). These pages are replete with the details of Dr. Silverstein's treatment. The ALJ relied on these assessments in his opinion. (Tr. 17). Plaintiff argues that the ALJ had an obligation to re-contact Dr. Silverstein solely because Dr. Silverstein had an extensive treatment history with Plaintiff. This proposition misunderstands and misstates the law. The Court finds no material ambiguity in the record and, accordingly, finds no need to remand for further completion of the record.

### D. The ALJ's evaluation of Plaintiff's mental impairments

Plaintiff argues that the ALJ failed to support his findings about Plaintiff's impairment with evidence.  P. Mem. 20.  This failure, she argues, is grounds for remand.  Id.  The Court disagrees.

The Regulations provide:  "Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s)."  20 C.F.R §§404.1520a, 416.920a.  The ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment."  20 C.F.R §§ 404.1520a (c), 416.920a(c).

Plaintiff argues the ALJ did not rely on any evidence when he determined Plaintiff's mental impairments.  P. Mem. 20.  This argument is unavailing.  The ALJ based his summary of Plaintiff's mental impairments on Plaintiff's testimony as well as other evidence in the record.  (Tr. 14).  Furthermore, Plaintiff does not argue that the ALJ left evidence out of his evaluation or made any errant statements, and she does not cite any case law that supports the conclusion that the ALJ applied an erroneous legal standard  in reaching his determination of Plaintiff's mental impairments.  Accordingly, the Court finds no reason to remand on this ground.

### E.  The ALJ's function by function analysis

Plaintiff argues that the ALJ erred by failing to perform a function-by-function analysis of Plaintiff's limitations in his evaluation of Plaintiff's RFC.  P. Mem. 20-21.  The

Court finds the ALJ's assessment of Plaintiff's RFC to be legally sufficient and supported by substantial evidence.

An ALJ must evaluate a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). After evaluating the evidence, the ALJ must make specific findings about the Plaintiff's functional capacity without making conclusory statements. Farley v. Comm'r of Soc. Sec., 2011 U.S. Dist. LEXIS 103489 at *32. "The ALJ must avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the evidence supports her conclusions, and discussing the claimant's ability to maintain sustained work activity, but she need not provide a narrative discussion for each function." Novak v. Astrue, No. 07 Civ. 8435, 2008 WL 2882638 at *3 & n. 47 (S.D.N.Y. 2008). Failure to re-contact the treating physician is not per se an error requiring remand. See Cichocki v. Astrue, 2013 WL 4749644 (2d Cir. 2013). Simply stated, when the ALJ addresses all relevant functional limitations, remand is unnecessary. See id.

According to the Social Security Administration's regulations, the relevant functions of sedentary work are "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. 404.1567(a)(3).

Plaintiff argues that "the ALJ failed to cite any evidence that Plaintiff could sit, stand, or walk for the requisite amount of time required for sedentary work." P. Mem. 21. The

Court finds several citations by the ALJ that support the conclusion that Plaintiff had the capability to perform sedentary work.

First, the ALJ cited Dr. Ganesh's examination of Plaintiff. Plaintiff reported to Dr. Ganesh that she could do some cooking and shopping. (Tr. 19). Her blood pressure and other vital signs were normal. (Tr. 19). She walked with a normal gait without any assistive device. (Tr. 19). Plaintiff did not need assistance in changing clothes or getting on or off the examination table. (Tr. 19). Her lungs were clear with no chest wall abnormality. (Tr. 19). Her heart condition was normal and there were no abnormalities in her body system. (Tr. 19). She had full strength and range of motion in her extremities, but had limited range of motion in her lumbar spine. (Tr. 19). Deep tendon reflexes were equal and no motor or sensory deficit was observed. (Tr. 19). From these symptoms, Dr. Ganesh concluded that Plaintiff had no gross limitations in sitting, standing, or walking. (Tr. 19). Dr. Ganesh did find, however, that Plaintiff she had mild or moderate imitations in lifting, carrying, pushing, and pulling. (Tr. 19).

Second, the ALJ cited the fact that Plaintiff is capable of performing daily routine tasks. She cooks and shops for groceries regularly. (Tr. 21). She was able to drive herself to the hearing with the ALJ without any assistance. (Tr. 21). Plaintiff also testified that she plays video games and attends church. (Tr. 21).

Third, the ALJ relied heavily on Dr. Kudler's assessment of Plaintiff's mental RFC. Dr. Kudler noted that Plaintiff had only mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (Tr. 20). From this, Dr. Kudler concluded that Plaintiff was capable of simple, unskilled jobs. (Tr. 20).

The Court rejects Plaintiff's argument that the ALJ's assessment of Plaintiff's RFC was deficient. Although the ALJ did not perform a detailed narrative of each of Plaintiff's functions, the record contains substantial evidence supporting the conclusion that Plaintiff is Plaintiff is capable of performing basis functions relevant to the full range of sedentary work. Therefore, the Court finds no error in the ALJ's assessment of Plaintiff's RFC.

### F. Plaintiff's credibility

Plaintiff argues that the ALJ erred in according little credibility to her statements concerning the intensity, persistence, and limiting effects of her symptoms. P. Mem. 21. The Court finds this argument unavailing. In evaluating a claimant's RFC, the ALJ considers the claimant's statements about symptoms of her disability, including pain. See 20 C.F.R. 404.1529. The claimant's statements alone will not establish that the claimant is disabled. Id. This claimant must show other objective evidence to support her contention that she is disabled. Id. The ALJ may compare the claimant's statements to medical evidence and evidence of the claimant's daily activities. Id.; Rosado v. Shalala, 868 F.Supp. 471, 472-73 (E.D.N.Y. 1994).

Here, there was substantial evidence that contradicted Plaintiff's statements about the intensity and limiting effect of her symptoms. Plaintiff claimed she was only capable of being up for three to four hours per day, and the rest of the day she would have to spend in bed. (Tr. 16). She contends that the most she was able to carry was a gallon of milk and that she was not able to walk far carrying items. (Tr. 16). She claimed she had difficulty performing household tasks such as carrying a laundry basket up and down the stairs. (Tr. 16). On a scale of one to ten, she rated her back pain as being between a seven and nine.

(Tr. 16).  She also alleged disability due to a heart condition, diabetes, anemia, and depression.  (Tr. 37, 183).

First, Plaintiff contradicted her own assertions that she was disabled by a heart condition.  In her hearing testimony she testified that she had a heart attack four years prior to the hearing.  (Tr. 38).  After her heart attack she had a stent placed in her heart.  (Tr. 38).  Plaintiff testified, however, that her heart problems do not affect her daily life.  (Tr. 38).  The ALJ noted this in his decision.  (Tr. 17).

The ALJ accorded great weight to Dr. Ganesh's opinion.  As stated above, Dr. Ganesh reported Plaintiff's blood pressure and other vital signs were normal.  (Tr. 19).  She walked with a normal gait without any assistive device.  (Tr. 19).  Plaintiff did not need assistance in changing clothes or getting on or off the examination table.  (Tr. 19).  Her lungs were clear with no chest wall abnormality.  (Tr. 19).  Her heart condition was normal and there were no abnormalities in her body system.  (Tr. 19).  She had full strength and range of motion in her extremities, but had limited range of motion in her lumbar spine.  (Tr. 19).  Deep tendon reflexes were equal and no motor or sensory deficit was observed.  (Tr. 19).  From these symptoms, Dr. Ganesh concluded that Plaintiff had no gross limitations in sitting, standing, or walking.  (Tr. 19).  Dr. Ganesh also found she had mild or moderate imitations in lifting, carrying, pushing, and pulling.  (Tr. 19).

The ALJ also accorded great weight to Dr. Kudler's opinion.  Dr. Kudler opined that Plaintiff had mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence, and pace.  (Tr. 20).  From this Dr. Kudler concluded that Plaintiff was capable of simple, unskilled jobs.  (Tr. 20).

Finally, the ALJ compared Plaintiff's statements to evidence of Plaintiff's daily activities. The ALJ found Plaintiff takes care of her niece. (Tr. 191). Plaintiff also takes care of her own hygiene and grooming needs. (Tr. 45). For recreation, Plaintiff plays computer games and reads history on the internet. (Tr. 45). She also does work around the house such as cooking, laundry with the help of her sons, and dish washing. (Tr. 45). Plaintiff was able to leave the house to go grocery shopping, attend church occasionally, and socialize with relatives. (T. 46). Plaintiff also had no problem driving herself to her hearing. (T. 35).

The ALJ relied on medical evidence and evidence of Plaintiff's daily activities to discredit Plaintiff's statements about her limitations from her symptoms. Such weighing of evidence was proper, and the Court finds that the ALJ did not commit an error.

**G. Step 5**

Plaintiff argues that the ALJ erred in failing to obtain a vocational expert's testimony in determining the jobs that Plaintiff is capable of performing. P. Mem 24-25. The Court finds the Plaintiff's argument unconvincing.

Once the ALJ has determined whether a claimant has a severe impairment, what the claimant's RFC is, and whether the claimant can return to her prior employment, the ALJ must then determine whether there are any jobs in the local or national economy the claimant can perform. 20 C.F.R. 404.1520. When the claimant has no non-exertional limitations, the ALJ may rely on the claimant's exertion level, age, education level, and work experience to determine what jobs the claimant is capable of doing based on the "grids." 20 C.F.R. Pt. 404, Subpt. P, App. 2. When the claimant has a combination of exertional and

non-exertional limitations, the grids may not be controlling.  Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).  The grids will not control the outcome if the claimant has any non-exertional limitations that "significantly limit the range of work permitted by his exertional limitations."  Id. at 605.  If claimant's non-exertional limitation further limits the work permitted by his non-exertional limitations, then the ALJ must have a vocational expert to testify as to whether the claimant can do any job in the national or local economies.  Id.

Plaintiff asks the Court to find error in the ALJ's failure to use a vocational expert.  P. Mem. 24-25.  She correctly states the rule that when the ALJ finds a claimant has substantial non-exertional limitations, the ALJ must call on a vocational expert in lieu of the grids.  P. Mem 24.  Plaintiff next correctly asserts that the ALJ found Plaintiff's depression, a non-exertional limitation, to be a severe impairment.  P. Mem. 24-25.  Plaintiff's argument falters when she asserts that a vocational expert was necessary after the ALJ found Plaintiff's depression to be a severe impairment.  P. Mem. 24-25.

Plaintiff's mistake is that she conflates "severe impairment" with a non-exertional limitation that "significantly limits the range of work permitted by exertional limitations." "Severe impairment" is a term of art that means a claimant has anatomical, phychological, or physiological abnormalities that prevent her from performing basic work functions.  20 C.F.R. 404.1508, 404.1520(c).  The ALJ had to determine whether Plaintiff had a severe impairment before moving onto his evaluation of Plaintiff's RFC to determine the range of work Plaintiff could do.  If the range of work to which Plaintiff was limited was further restricted by her non-exertional limitations, then a vocational expert would be necessary.

Here, however, the ALJ did not find that Plaintiff's non-exertional limitations significantly limited the range of work her exertional limitations permitted. The ALJ reasoned that based on Plaintiff's physical and mental limitations she was capable of doing sedentary work. (Tr. 21). There was no indication that Plaintiff's non-exertional limitations restricted her range of work permitted by her exertional limitations. Furthermore, Dr. Kudler opined that Plaintiff was capable of performing low skilled jobs. Accordingly, the ALJ was not obligated to obtain the opinion of a vocational expert.

## IV. CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.

**IT IS SO ORDERED.**

Dated: September 30, 2013

Thomas J. McAvoy
Senior, U.S. District Judge